# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| NARVIEZ V. ALEXANDER, ) | 3:11-cv-0217-LRH (WGC) |
| Plaintiff, ) | |
| ) | **REPORT AND RECOMMENDATION** |
| vs. ) | **OF U.S. MAGISTRATE JUDGE** |
| ) | |
| STATE OF NEVADA, et al., ) | |
| Defendants. ) | |

This Report and Recommendation is made to the Honorable Larry R. Hicks, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is Defendants' Motion for Summary Judgment. (Doc. # 49.)[1] Plaintiff opposed (Doc. # 62) and Defendants replied (Doc. # 67). After a thorough review, the court recommends that Defendants' motion be granted.

## I. BACKGROUND

At all relevant times, Plaintiff Narviez V. Alexander (Plaintiff) was in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Am. Compl. (Doc. # 7).) The events giving rise to this action took place while Plaintiff was housed at Ely State Prison (ESP). (*Id*.) Plaintiff is currently housed at Lovelock Correctional Center (LCC). (Defs.' Mot. for Sum. J. (Doc. # 49) at 2.) Plaintiff, a *pro se* litigant, brings this action pursuant to 42 U.S.C. § 1983. (Doc. # 7 at 1.) The remaining defendants are Michael Koehn, Mark Drain, Renee Baker, E.K.

---

[1] Refers to the court's docket number. Doc. # 18 and Doc. # 19 are identical.

McDaniel, Howard Skolnik, Bruce Bannister, Terri Jacobs, Angela Gregersen, and Greg Cox (Defendants). (*See* Screening Order (Doc. # 13).)

Plaintiff's complaint, originally filed in the Seventh Judicial District Court of the State of Nevada on February 3, 2011, was removed by Defendants. (*See* Doc. # 1.) Plaintiff subsequently filed his Amended Complaint. (Doc. # 7.) On screening, the court found Plaintiff states colorable claims for deliberate indifference to a serious medical need under the Eighth Amendment, and violation of his due process rights under the Fourteenth Amendment. (*See* Doc. # 13.)

Plaintiff's *Eighth Amendment* claim is set forth in Count I of his Amended Complaint. (Doc. # 7 at 4-8.) Plaintiff alleges that he arrived at ESP on June 9, 2010. (*Id*. at 5-6.) He began to have painful symptoms in his legs, arms, back, and right side. (*Id*. at 6.) From August through October 2010, Plaintiff was examined and received blood tests and antibiotic medication from Dr. Martin. (*Id*.) On November 9, 2010, Plaintiff was examined by Dr. Koehn, and additional blood tests were performed. (*Id*.) Plaintiff alleges that on December 10, 2010, Defendant Dr. Koehn diagnosed him as positive for sickle cell trait. (*Id*. at 7.) Plaintiff asserts that Dr. Koehn informed him that as a complication of having sickle cell trait, he was experiencing migraines, nausea, muscle pain, abdominal pain, weakness, and fatigue due to the high elevation and thin air in Ely, Nevada. (*Id*.) Plaintiff alleges that Dr. Koehn also told Plaintiff that the only treatment option was transfer to a lower elevation facility. (*Id*.) Plaintiff requested a medical transfer order to a lower elevation facility, which Dr. Koehn refused, noting Plaintiff's classification points were too high for a transfer. (*Id*.) Plaintiff asserts that Dr. Koehn intentionally denied him the only available treatment for his condition. (*Id*.) Plaintiff also alleges that on December 14, 2010, and thereafter, he informed Defendants Drain, Baker, McDaniel, Skolnik, Bannister, Jacobs, and Gregersen of his medical condition and need for a transfer, but they failed to take action to have Plaintiff transferred to another facility. (*Id*. at 5.)

Plaintiff's *due process* claim is set forth at Count II of his Amended Complaint.

(Doc. # 7 at 8-10.) Plaintiff alleges that Defendants Baker, Drain, Skolnik, Cox, and McDaniel have arbitrarily placed him in administrative segregation indefinitely, without providing him proper due process protections. (*Id.*)

Defendants move for summary judgment, arguing: (1) Plaintiff did not suffer from a sufficiently serious medical need; (2) Plaintiff received adequate treatment and there was no deliberate indifference; (3) Plaintiff received all the due process protections he was due with respect to his placement in administrative segregation; (4) Defendants Drain, Baker, McDaniel, and Skolnik should be granted summary judgment as to the Eighth Amendment claim because they did not personally participate in the alleged constitutional violation; (5) Defendant Skolnik should be granted summary judgment as to the due process claim because he did not personally participate in the alleged constitutional violation; (6) Defendants Drain, Baker, McDaniel, Skolnik, Jacobs and Gregerson are entitled to qualified immunity with respect to the Eighth Amendment claim; and (7) Defendants Baker, Drain, Skolnik, Cox, and McDaniel are entitled to qualified immunity with respect to the due process claim. (Doc. # 49.)

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). All reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250.

The moving party bears the burden of informing the court of the basis for its motion,

together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed.R.Civ.P. 56(c).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v.*

4

1  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute,
2  the opposing party need not establish a material issue of fact conclusively in its favor. It is
3  sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the
4  parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors
5  Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The
6  nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations
7  that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the
8  assertions and allegations of the pleadings and set forth specific facts by producing competent
9  evidence that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

10  At summary judgment, a court's function is not to weigh the evidence and determine
11  the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S.
12  at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences
13  are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is
14  not significantly probative, summary judgment may be granted. *Id*. at 249-50, 255 (citations
15  omitted).

### III.  DISCUSSION

**A. EIGHTH AMENDMENT CLAIM**

**1. Legal standard**

A prisoner can establish an Eighth Amendment violation arising from deficient medical
care if he can prove that prison officials were deliberately indifferent to a serious medical need.
*Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A finding of deliberate indifference involves the
examination of two elements: "the seriousness of the prisoner's medical need and the nature
of the defendant's responses to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.
1992), *rev'd on other grounds, WMX Tech., Inc. v. Miller*, 104 F.3d. 1133 (9th Cir. 1997). "A
'serious' medical need exists if the failure to treat a prisoner's condition could result in further
significant injury or the 'unnecessary and wanton infliction of pain.'" *Id*. (citing *Estelle*, 429
U.S. at 104). Examples of conditions that are "serious" in nature include "an injury that a

5

1 reasonable doctor or patient would find important and worthy of comment or treatment; the
2 presence of a medical condition that significantly affects an individual's daily activities; or the
3 existence of chronic and substantial pain." *Id.* at 1059-60; *see also Lopez v. Smith*, 203 F.3d
4 1122, 1131 (9th Cir. 2000) (quoting *McGuckin* and finding that inmate whose jaw was broken
5 and mouth was wired shut for several months demonstrated a serious medical need).

6 If the medical needs are serious, Plaintiff must show that Defendants acted with deliberate indifference to those needs. *Estelle*, 429 U.S. at 104. "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id.* Inadvertence, by itself, is insufficient to establish a cause of action under § 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Farmer*, 511 U.S. at 858). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment" or the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hunt v. Dental Dep't.*, 865 F.2d 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

22 In addition, a prison physician is not deliberately indifferent to an inmate's serious medical need when the physician prescribes a different method of treatment than that requested by the inmate. *See McGuckin*, 974 F.2d at 1059 (explaining that negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (difference of opinion regarding the best course of medical treatment does not amount to deliberate indifference);

6

*Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (difference of opinion between a prisoner-patient and medical staff regarding treatment is not cognizable under § 1983). To establish that a difference of opinion amounted to deliberate indifference, the inmate "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the course of treatment was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citations omitted).

### 2. Plaintiff's treatment & medical evidence

Dr. Koehn examined Plaintiff on November 9, 2010, regarding complaints of a cough and tightness in his chest, and also discussed the results of an earlier x-ray and blood tests. (Doc. # 49-6 Koehn Decl. (Ex. B) at ¶ 4, Doc. # 51-1 at 7.) Plaintiff also complained of pain in his arms and legs when not exercising, despite being physically fit. (*Id.*) Dr. Koehn noted that Plaintiff moved with difficulty, had a regular heart rhythm, clear lungs and no gait abnormalities. (*Id.*)

On December 10, 2010, Dr. Koehn examined Plaintiff again and discussed his blood test results, and his sickle cell hemoglobin results in particular. (Doc. # 49-6 Ex. B. at ¶ 5, Doc. # 51-1 Ex. 1 at 7.) Dr. Koehn relayed his view that Plaintiff had sickle cell trait (which is different than sickle cell anemia), which could be responsible for the cramping and fatigue symptoms. (*Id.*) He noted that all Plaintiff's vital signs were normal. (*Id.*) Finally, Dr. Koehn pointed out there were no treatment options other than to admit him at the infirmary and give him supplemental oxygen. (*Id.*)

Dr. Koehn examined Plaintiff again on January 2, 2011, regarding a complaint of ongoing pain in the right abdomen, and his concern he suffered a splenic infarction. (Doc. # 49-6 Ex. B. at ¶ 6, Doc. # 51-1 Ex. 1 at 6.) According to Dr. Koehn, a splenic infarction can occur in a patient with sickle cell trait as a result of low oxygen saturation of the blood. (*Id.*) Plaintiff was demanding oxygen saturation evaluation several times a day. (*Id.*) Dr. Koehn performed an oxygen saturation evaluation which revealed Plaintiff's blood oxygen levels were

7

within normal limits. (*Id.*) While he found nothing alarming, Dr. Koehn nonetheless admitted Plaintiff to the infirmary to monitor his oxygen saturation and ability to exercise. (*Id.*)

According to medical progress notes, Plaintiff was seen by Nurse Practitioner Martin on January 8, 2011, regarding complaints of abdominal pain. (Doc. # 49-6 Ex. B at ¶ 7, Doc. # 51-1 Ex. 1 at 6.) Plaintiff expressed his belief he might be suffering from splenic infarction. (*Id.*) Plaintiff requested to see a specialist and transfer to a lower elevation. (*Id.*) Nurse Practitioner Martin referred Plaintiff to Dr. Mar. (*Id.*) His vital signs and oxygen saturation were monitored for two days, and no findings of concern were identified. (Doc. # 49-6 Ex. B at ¶ 8, Doc. # 51-1 Ex. 1 at 5.)

Plaintiff was seen by Dr. Mar on January 11, 2011. (Doc. # 49-6 Ex. B at ¶ 10, Mar Decl. (Ex. C) at ¶ 3, Doc. # 51-1 Ex. 1 at 4-5.) He found Plaintiff's examination results to be normal and concluded that Plaintiff's sickle cell trait presented no health problems so there was no medical reason to warrant transfer to another institution. (*Id.*) Dr. Mar observed: full expansion breathing; normal temperature; clear lungs; regular cardiovascular rhythm; normal abdominal area; responsive pupils; and normal muscular range of motion. (Doc. # 49-6 Ex. C. at ¶ 3.) Dr. Mar conducted a pulse oximetry test, which revealed normal levels of oxygen saturation. (*Id.*) Progress notes indicate Plaintiff was given pulse oximetry testing over a period of two months, a method of measuring the oxygenation of hemoglobin via a sensor, and Plaintiff's oxygen saturation was found to be within normal limits. (Doc. # 49-6 Ex. B at ¶ 11.) Plaintiff's oxygen saturation level was measured again on January 16, 2011, and was found to be within normal limits. (*Id.* at ¶ 12)

According to Dr. Mar, based on his review of Plaintiff's medical history and physical examination on January 11, 2011, he found no evidence that Plaintiff's sickle cell trait presented a medical problem, and concluded there was no medical reason to transfer him to another institution. (Doc. # 49-6 Ex. C at ¶ 4.) Dr. Mar indicates he had no basis to conclude that Plaintiff suffered a splenic infarction, as Plaintiff's medical records consistently showed he had a healthy level of oxygen saturation. (*Id.* at ¶ 5.)

8

According to Dr. Koehn, Plaintiff's concern of suffering splenic infarction as a result of his housing at ESP was unfounded because while common in persons who have *sickle cell anemia*, splenic infarction is "vanishingly rare" in patients with *sickle cell trait*. (*Id.* at ¶ 13.) Dr. Koehn opines that because Plaintiff's oxygen saturation level, even at ESP's altitude, would be considered normal at sea level, Plaintiff's confinement at ESP does not aggravate his sickle cell trait. (*Id.* at ¶ 9.) He also notes the apparent contradiction between Plaintiff's complaints of upper right quadrant pain, when the spleen is in the upper left quadrant. (*Id.* at ¶ 13.) He further comments that Plaintiff exhibits healthy levels of oxygen saturation and has otherwise been deemed healthy. (*Id.*) Dr. Koehn concludes Plaintiff's housing at ESP does not create any adverse consequences to his sickle cell trait. (*Id.*)

### 3. Analysis

First, Plaintiff must establish he has a serious medical need. While it is undisputed that Plaintiff has the sickle cell trait, Defendants dispute whether this has manifested a physical condition that rises to the level of a serious medical need. Assuming, without deciding that Plaintiff suffers from a sufficiently serious medical need, the court finds that Plaintiff, at best, has presented a difference of opinion regarding the course of treatment chosen by ESP medical personnel and the course of treatment he believes should be taken, *i.e.*, transferring him to a lower elevation.

As set forth above, in order to establish that a difference of opinion amounts to deliberate indifference, the inmate "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citations omitted). There is simply no evidence that the course of treatment chosen by Plaintiff's health care professionals was "medically unacceptable under the circumstances" or that it was "in conscious disregard of an excessive risk to his health." Instead, the evidence before the court shows that Plaintiff's condition was adequately monitored through oxygen saturation evaluation, which has consistently revealed that Plaintiff's blood oxygen levels are

9

1  within normal limits, contradicting Plaintiff's belief that being housed at ESP has adversely
2  affected his health. While Plaintiff claims that he was told the elevation at ESP was causing his
3  pain (Doc. # 62 at 7), this is belied by his medical records.

4  Accordingly, Defendants' motion for summary judgment should be granted as to
5  Plaintiff's Eighth Amendment claim.

6  **B. DUE PROCESS CLAIM**

7  The Fourteenth Amendment provides, "[n]o State shall...deprive any person of life,
8  liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. To invoke its
9  protections, an inmate "must establish that one of these interests is at stake." *Wilkinson v.*
10 *Astrue*, 545 U.S. 209, 221 (2005); *see also Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

11 In analyzing the procedural safeguards owed to an inmate under the Due Process
12 Clause of the Fourteenth Amendment, the court considers two elements: (1) whether the
13 inmate suffered a deprivation of a constitutionally protected interest; and (2) whether the
14 inmate suffered a denial of adequate procedural protections. *See Biggs v. Terhune*, 334 F.3d
15 910, 913 (9th Cir. 2003) (citations omitted).

16 "A liberty interest may arise from the Constitution itself, by reason of guarantees
17 implicit in the word 'liberty,'...or it may arise from an expectation or interest created by state
18 laws or policies[.]" *Wilkinson*, 545 U.S. at 221 (internal citations and parenthetical omitted).

19 First, under the Constitution itself, a liberty interest is implicated when the conditions
20 of confinement "[exceed] the sentence in such an unexpected manner as to give rise to
21 protection by the Due Process Clause of its own force." *Mitchell v. Dupnik*, 75 F.3d 517, 523
22 (9th Cir. 1996) (internal quotation marks and citation omitted.)

23 Second, liberty interests created by the state are generally limited to freedom from
24 restraint that "imposes atypical and significant hardship on the inmate in relation to the
25 ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). To determine
26 whether a restraint imposes "atypical and significant hardship," a court considers a condition
27 or combination of conditions or factors on a case by case basis, rather than invoking a single
28

1  standard. *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003). Three factors have been
2  used to guide this inquiry: (1) whether the challenged condition mirrored those conditions of
3  ordinary prison life; (2) the duration of the condition, and the degree of restraint imposed; and
4  (3) whether the state's action will invariably affect the duration of the prisoner's sentence. *Id.*
5  (citing *Sandin*, 515 U.S. at 486-87; *Keenan v. Hall*, 84 F.3d 1083, 1089 (9th Cir. 1996)
6  (quotations omitted)).

7  First, while Plaintiff asserts that there is a factual issue regarding whether his
8  placement in segregation constitutes an "atypical and significant hardship" (Doc. # 62 at 11),
9  the court finds that there is simply *no evidence* to establish to support a conclusion Plaintiff
10 has suffered an "atypical and significant hardship" "in relation to the ordinary incidents of
11 prison life" by being placed in administrative segregation. *Sandin*, 515 U.S. at 484.

12 Next, even if the court found that Plaintiff was deprived of a liberty interest, it appears
13 that Plaintiff was given adequate procedural protections. When an inmate is placed in
14 segregated housing, he must be provided, within a reasonable time after such placement, with
15 an informal, non-adversary review of the evidence justifying the decision to segregate the
16 inmate. *See Hewitt v. Helms*, 459 U.S. 460, 476 (1983), *abrogated in part on other grounds*
17 *by Sandin v. Conner*, 515 U.S. 472 (1995). Unlike a disciplinary proceeding, the inmate is not
18 entitled to "detailed written notice of charges, representation of counsel or counsel-substitute,
19 an opportunity to present witnesses, or a written decision describing the reasons for placing
20 the prisoner in administrative segregation." *Toussaint v. McCarthy,* 801 F.2d 1080, 1100-01
21 (9th Cir. 1986), *abrogated in part on other grounds by Sandin*, 515 U.S. 472. After being
22 placed in segregation, prison officials must periodically review the initial placement. *See*
23 *Hewitt*, 459 U.S. at 477 n. 9.

24 Plaintiff was accepted into custody at NDOC in 1994, and was most recently housed at
25 ESP from June 9, 2010, to September 29, 2011, when he was transferred to LCC. (Doc. # 49-1
26 Ex. A at ¶ 7.) Upon arrival to ESP on June 9, 2010, Plaintiff was seen by a classification
27 committee, consisting of two case workers, two medical employees, and Defendant Baker.
28

11

(Doc. # 49-1 Ex. A at ¶ 8, Doc. # 49-5 Ex. 7 at 16.)  The committee placed Plaintiff in administrative segregation because he had been found responsible for sexually assaulting a seventeen year old inmate at High Desert State Prison (HDSP) on June 30, 2009, and because he had already been designated to administrative segregation when he arrived at ESP from HDSP. (*Id.*)

Plaintiff was seen on June 24, 2010, for a full classification committee hearing.  (Doc. # 49-1 Ex. A at ¶ 9, Doc. # 49-5 Ex. 7 at 16.)  Defendant Baker was present at the hearing, and asserts that Plaintiff was allowed to make statements and present evidence at the hearing. (*Id.*)  Defendant Baker elected to keep Plaintiff housed in administrative segregation because of the sexual assault (*Id.*)

On July 22, 2010, Plaintiff was seen for a re-evaluation of his classification. (Doc. # 49-1 Ex. A at ¶ 10, Doc. # 49-5 Ex. 7 at 16.) Plaintiff requested a transfer to a medium custody institution, or into ESP's general population. (*Id.*) Plaintiff was not eligible for transfer to a medium custody institution because he had a high risk factor score.  (*Id.*)

Plaintiff received subsequent classification review hearings on September 2, 2010, September 30, 2010, October 27, 2010, November 10, 2010, January 27, 2011, February 25, 2011, March 30, 2011, May 31, 2011, July 28, 2011, August 9, 2011, August 25, 2011, August 26, 2011, and September 21, 2011.  (Doc. # 49-1 Ex. A at ¶ 11, Doc. # 49-5 Ex. 7 at 17-18.) Plaintiff stayed discipline free from the time he arrived at ESP on June 9, 2009, resulting in a drop in his risk factor score, and over time he became eligible for a less restrictive classification. (Doc. # 49-1 Ex. A at ¶ 11.) Plaintiff was transferred to LCC's general population on September 29, 2011. (*Id.*, Doc. # 49-5 Ex. 7 at 19.)

The foregoing evidence establishes that Plaintiff was initially placed in segregated housing status after an intake classification hearing and full classification hearing, and Plaintiff subsequently received regular reviews of his classification status.  While Plaintiff claims that Defendants falsified Plaintiff's offender information summary (Doc. # 62 at 11), there is no evidence to support this assertion.  More importantly, there is simply no evidence

of any constitutional violation.

Accordingly, summary judgment should be granted as to Plaintiff's due process claim related to his placement in administrative segregation.

Because the court has recommended granting summary judgment as to both of Plaintiff's claims on the grounds there is no evidence of any constitutional violation, it need not reach Defendants' arguments regarding personal participation and qualified immunity.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order **GRANTING** Defendants' motion (Doc. # 49).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the District Court's judgment.

DATED: April 4, 2012.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE

13